# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 12, 2014

## STATE OF TENNESSEE v. BRIAN ONEAL ELLIOTT

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2011-A-269     Cheryl A. Blackburn, Judge**

---

**No. M2014-00083-CCA-R3-CD - Filed October 15, 2014**

---

The appellant, Brian Oneal Elliott, challenges the length of the twenty-five-year maximum sentence the trial court imposed for his conviction of second degree murder. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Ryan C. Caldwell (on appeal) and Dale Quillen (at trial), Nashville, Tennessee, for the appellant, Brian ONeal Elliott.

Robert E. Cooper, Jr., Attorney General & Reporter; Caitlin Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The appellant was charged with the first degree murder of Miguel Tobias. Subsequently, he agreed to plead guilty to second degree murder. The plea agreement provided that the trial court would determine the length of the appellant's sentence.

At the guilty plea hearing, the State recited the following factual basis for the plea:

[O]n April 16th, 2010, the victim Miguel Tobias (phonetic) was

on the porch of 3710 Ezell Road in Davidson County with another individual. It was mid afternoon, and a car approached the house and stopped. Mr. Tobias went to see what the individuals wanted. When he got close to the car, the front passenger rolled down the window and shot multiple times killing Mr. Tobias. The victim's wife was in the house and heard the shots as did the couple's three young children. The police responded and began their investigation. They learned the make, model, and partial plate number of the car. They later determined that it belonged to Trevarius (phonetic) Maples. As the investigation continued, the detective assigned to the murder learned that there had been a report of a rape at that location. Sex abuse detectives confirmed that the rape had been reported at that same location on or about April 12th, three days before the homicide. The victim of that rape was fourteen-year old [P.E.].[1] After learning this information, the homicide detectives spoke with [P.E.] and her mother. [P.E.] told the detectives that on April 12th, 2010, she and a friend skipped school and went to 3710 Ezell Road where a cousin of [P.E.'s] friend resided. While they were there [P.E.] was raped by a man. She reported the rape to the police immediately, and the police determined that the man who raped [P.E.] was Romel Roberto Guafarro (phonetic).

On April 16th, 2010, [P.E.'s] uncle, [the appellant], picked her up from middle school. Trevarius Maples was driving the vehicle. When [P.E.] got in the car, [the appellant] instructed her to show them where the rape occurred. They drove down Ezell Road, and [P.E.] pointed out the house at 3710 Ezell. They drove past the house, and [the appellant] then instructed Maples to stop the car. [The appellant] got out of the car and retrieved a gun. Maples then drove back to 3710 Ezell. When the car pulled up to the house, there were two men on the porch, one of which was the victim, Miguel Tobias. As Mr. Tobias was walking up to the car, [P.E.] cried out that he was not the man who had raped her. [The appellant] nonetheless rolled down the window and shot Tobias causing his death.

---

[1]It is the policy of this court to refer to minor victims of sexual crimes by their initials.

I would note that if the case had gone to trial today the State would have severed the two defendants. Maples would have testified as [P.E.] would have testified, that [P.E.] clearly told [the appellant] the man was not her rapist before he was murdered. The proof would also show that the victim looked nothing like the rapist. The victim was an average height and weight whereas the rapist weighed over 250 pounds.

Damaris Santiago, the victim's wife, testified at the sentencing hearing that she and the victim had three children, whose ages were twelve, ten, and seven years. At the time of the shooting, she and the children were inside the house at 3710 Ezell Road. Mrs. Santiago heard two gunshots but did not think anything was wrong until one of the victim's friends came inside and told her to come outside. She walked outside and saw the victim lying on the ground.

Mrs. Santiago said that the victim was friendly, funny, and sweet and that he loved his children. After the victim's death, the children required therapy. Their ten-year-old son continued to have trouble in school and feared that he also might lose his mother.

Ernesto Castro, the victim's brother, testified that he lived in California. On Friday afternoon after the shooting, Mrs. Santiago called and informed him of the victim's death. Mr. Castro had eight brothers and sisters but was closest to the victim. He described the victim as honest and hard-working.

Stacy Walling, P.E.'s mother, testified that the appellant was P.E.'s paternal uncle. Walling acknowledged that she was testifying only because the State subpoenaed her. At the time of the shooting, P.E. was fifteen years old, and she had a close relationship with the appellant. P.E. promptly disclosed the rape to her mother, who in turn reported it to the police. P.E. did not like to talk about the shooting; however, she eventually told Walling that she was present when it occurred. Walling said that P.E. was depressed because of the rape, that P.E. blamed herself for the appellant's being in jail, and that P.E. was in counseling.

Walling said that P.E. had been subpoenaed to testify at the appellant's trial. P.E. did not want to testify and indicated that "she would rather go to jail than [the appellant]." P.E. had cried after "certain people" pressured her not to testify against the appellant; however, Walling did not know who tried to intimidate P.E.

On cross-examination, Walling said that P.E. told her about the rape the day it happened. Afterward, Walling took P.E. to the hospital. Walling said that she thought the appellant knew about the rape, noting, "I'm sure everybody found out. It just spreads fast."

On redirect examination, Walling acknowledged that P.E. had said that she told the appellant just before he shot the victim that the victim was not the man who raped her. On recross-examination, Walling stated that she did not know whether the appellant heard P.E.'s statement.

The thirty-four-year-old appellant testified that he wanted to apologize to the victim's family for his mistake. He said that he thought he was killing the man who had raped P.E. He did not recall P.E. saying the victim was not the rapist but did not deny that she could have made that statement; instead, he recalled her saying "that's them."

On cross-examination, the appellant said that Maples was driving the car. The appellant knew a gun was in the trunk of the car but could not recall who put it there. The appellant retrieved the gun before confronting the victim. He explained, "I was going into a situation where I didn't know if I was going to have to defend myself against whoever did this or not." The appellant denied that he intended to shoot and kill the person who raped his niece. He acknowledged that he did not say a word to the victim before shooting him, maintaining that he "lost control."

Ricky Waller, a community minister, testified that he had spoken with the appellant since the appellant's incarceration. Waller believed the appellant was remorseful and wanted to change his life.

Prior to imposing the sentence, the court explicitly considered the purposes and principles of the sentencing act and the facts and circumstances of the offense. The court noted that as a Range I, standard offender, the appellant was subject to a sentence of fifteen to twenty-five years for his Class A felony conviction. See Tenn. Code Ann. §§ 39-13-210(a); 40-35-112(a)(1). The court observed that the appellant had a prior history of criminal convictions, noting that he had one prior felony conviction of aggravated assault and eight prior misdemeanor convictions. Tenn. Code Ann. § 40-35-114(1). The court further found that the appellant was a leader in the commission of the offense. Tenn. Code Ann. § 40-35-114(2). The court also found that the appellant had failed to comply with the conditions of a sentence involving release into the community, as evidenced by at least two prior probation violations. Tenn. Code Ann. § 40-35-114(8). Finally, the court found that the appellant employed a firearm during the commission of the offense. Tenn. Code Ann. § 40-35-114(9). The court afforded the greatest weight to enhancement factors (1) and (9).

Regarding mitigation, the court noted the appellant's claim that he was provoked. Tenn. Code Ann. § 40-35-113(2). The court stated, however, that "[t]he problem is that there was no provocation on the part of this victim or anyone else there at the time." Accordingly, the court found that no mitigating factors were applicable and imposed a sentence of twenty-

five years.

Thereafter, the appellant, acting pro se, filed a petition for post-conviction relief. The court appointed counsel and held an evidentiary hearing. With the agreement of the State, the post-conviction court granted the appellant a delayed appeal on the sentencing issue.

On appeal, the appellant challenges the length of the sentence imposed by the trial court.

## II. Analysis

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and

40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant contends that the trial court erred by imposing the maximum sentence for his second degree murder conviction. The appellant does not dispute the application of enhancement factors (2) and (8). Additionally, he acknowledges that the trial court correctly applied enhancement factors (1) and (9), but he asserts that the trial court ascribed too much weight to those factors. This court has repeatedly cautioned that "[m]ere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence." State v. Banks, 271 S.W.3d 90, 146 (Tenn. 2008) (citing Carter, 254 S.W.3d at 345-46).

Further, the appellant maintains that the trial court erred by failing to apply mitigating factor (2). We disagree. The proof reveals that the appellant and Maples picked up P.E., drove to the house where the rape occurred and stopped. The victim and another individual were on the porch where the victim lived. When the victim approached the car P.E. told the appellant that the victim, who looked nothing like the rapist, was not the man who raped her. Nevertheless, the appellant shot him while the victim's wife and three children were inside the house. As the trial court aptly stated:

> [T]here was no provocation on the part of this victim or anyone else there at the time. . . . [The appellant] went out there to kill somebody. He was determined to do it. And whether or not he killed the right person or not is really irrelevant to the statute of murder. I mean, it was his intent to kill. And that's unfortunate . . . . [W]e don't take our – the law in our own hands. We don't go around shooting people because we think they've done something, especially in the presence of the person that's

victimized.

We conclude that the trial court did not err in applying any of the enhancement factors or in refusing to apply any mitigating factors.

### III.  Conclusion

We conclude that the trial court did not err in sentencing the appellant.  Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE